IN THE UNITED STATES DISTRICT COURT

FOR THE TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br>　　vs.<br><br>WILLIAM M. PEREZ,<br><br>　　　　　Defendant. | CRIMINAL CASE NO. 11-00082-02<br><br>**ORDER RE MOTION TO SUPPRESS ORAL STATEMENTS MADE BY DEFENDANT ON DECEMBER 14, 2010, DECEMBER 17, 2010, AND DECEMBER 13, 2011** |

The Motion to Suppress filed by Defendant William M. Perez came before this court for an evidentiary hearing on May 30, 2012. After hearing the testimony of witnesses and argument from counsel, the court took the Motion to Suppress under advisement. For the reasons discussed more fully herein, the court sets forth the bases for its decision in **GRANTING** in part and **DENYING** in part.

**I. FACTS**

Two federal agents for the Prosecution testified during the evidentiary hearing. There were no other testimonies offered. It should be noted that the parties do not dispute the fact that the Defendant was not warned of his *Miranda* rights.

1

**A. December 14, 2010 Questioning**

On December 14, 2010, between 10:00 p.m. and 12:00 a.m. of December 15, 2010, approximately ten (10) to fifteen (15) agents from the Federal Bureau of Investigation ("FBI"), Internal Revenue Service ("IRS"), and Naval Criminal Investigative Service ("NCIS")[1] executed a search warrant at the MGM Spa Building. The agents were wearing raid jackets with 6-inch "FBI" lettering on them. Underneath the raid jackets were bullet proof vests. The agents had side arms and flashlights with them.

The entrance door to the building was locked so agents initially rang the doorbell. When no one responded, the agents knocked and the knocking grew progressively louder until an Asian female came to the door. The "banging on the door" lasted for about 20-30 seconds long. It is unclear who unlocked the door but when the door was opened, Defendant William M. Perez was standing at the entrance door.

As the agent in charge of taking control of whoever came to the door, FBI Special Agent Frank L. Runles stepped into the building, laid his hand on the Defendant, and put him against the wall to the left of the door. FBI Agent Runles's hand was on the Defendant's back while the Defendant's face was facing the wall away from the agent. At some point, FBI Agent Runles holstered his weapon, handcuffed the Defendant's hands behind his back, and conducted a pat-down search of the Defendant. FBI Agent Runles informed the Defendant that this was being performed for both of their safety. This lasted approximately two minutes. Thereafter, FBI Agent Runles turned the Defendant around, held his arm, and escorted him to a flight of stairs leading to the game room.

In the meantime, while this was going on, the rest of the agents entered to secure the

---

[1] During FBI Agent Runles's testimony, he indicated that Homeland Security may have been involved in the execution of the search warrant but could not confirm with certainty.

2

building. Once the security check was completed, all weapons were holstered. FBI Agent Runles could not confirm if all the agents had their weapons drawn when they first entered the building, but he did confirm that it is standard procedure for an agent to draw his gun when entering and securing an area. After the building was secured, agents were posted at the exits of the building to ensure that the agents maintained control of the building. FBI Agent Runles testified that the agents exerted complete control of the premises.

As FBI Agent Runles and the Defendant approached the game room, the agent saw that the "situation had been contained" or that the place had been secured. At that point, FBI Agent Runles removed the cuffs,[2] provided the Defendant with the search warrant, and informed him why federal agents were at his place of business. FBI Agent Runles then directed the Defendant to take a seat by a corner poker table[3] near the game room door and to wait to be interviewed. In other areas of the game room, interviews were also being conducted by other federal agents. *See* Government Exhibit No. 12.

FBI Agent Runles and NCIS Agent Joseph Twilley were the agents who conducted the Defendant's interview. The agents sat on the other side of the poker table, directly across from the Defendant. FBI Agent Runles testified that no one was in between the Defendant and the game room door, and that the Defendant was closest to the door. Government Exhibit No. 11 shows that the Defendant was sitting in a corner, with one wall (and a closed door) to his left and another wall behind him. According to FBI Agent Runles, the game room door (to the defendant's right) was open at the time the Defendant was being interviewed. But FBI Agent Runles also testified that the game room door was likely closed when the agents were already inside the game room conducting interviews. At the time the agents first arrived at the MGM Spa

---

[2] The total length of time the Defendant was cuffed was approximately 2-3 minutes.
[3] *See* Government Exhibit No. 11.

3

Building, the double doors to the game room were both open.[4]

When the agents began the interview, they informed the Defendant that they wanted to speak with him about the poker game he was running.[5] At one point during the interview, the Defendant's cellular phone rang. The Prosecution failed to provide evidence as to who answered the Defendant's cellular phone. What is known is that when the phone rang (or "buzzed"), the Defendant informed the agents that it was co-defendant Wai Kam Ho calling. FBI Agent Runles then asked if he could speak with Mr. Ho. The total length of the interview lasted for approximately thirty (30) minutes.

After the interview, the Defendant was informed that the federal agents would be in the building for quite a while. The Defendant stayed for a bit, but then gave the keys to FBI Agent Runles for him to lock up the building once they were done. The raid ended and the agents left the premises at approximately 2:00 a.m. of December 15, 2010.

FBI Agent Runles testified that the Defendant never asked the agent if he should get a lawyer, nor did the Defendant inform the agent that he has an attorney. FBI Agent Runles further testified that he was not told by NCIS Agent Twilley that the defendant had an attorney. FBI Agent Runles also stated that he did not see any reference to an attorney's name on the Defendant's cellular phone when he spoke to Mr. Ho. In addition, FBI Agent Runles stated that he did not search the Defendant's cellular phone, and the agent does not recall seeing any one else search the Defendant's cellular phone.

At the night of the raid, the Defendant was not told he had to stay. However, the

---

[4] Government Exhibit Nos. 2, 3, and 4 show pictures of the game room door. The pictures show that the left door is closed and the right door is opened. The pictures were taken at the night of the execution of the search warrant, but the Prosecution failed to provide evidence as to the exact time each of the pictures was taken.

[5] The Prosecution failed to provide evidence as to the number of poker games that were in progress when the federal agents arrived at the scene but there was at least one game going on. *See* Government Exhibit No. 9.

4

Defendant was not told he could leave either. FBI Agent Runles testified that the individuals in the building were free to leave *once* they were finished being interviewed. FBI Agent Runles said that the federal agents did not tell people that they were not free to leave until they gave the agents an interview, but FBI Agent Runles stated that "I think everyone understood you're going to be interviewed and then once you're done, you'd leave." If someone had refused to be interviewed, then that person was free to go. There was no evidence that this was ever communicated to the Defendant or to the rest of the people being interviewed.

### B. December 17, 2010 Questioning

On December 17, 2010, FBI Agent Runles called the Defendant to return the keys. FBI Agent Runles believes it was the Defendant who suggested that they meet at the MGM Spa Building parking lot. FBI Agent Runles and NCIS Agent Twilley were present at that meeting.

Upon meeting, the agents returned the keys to the Defendant. The Defendant then unlocked the building, and the agents followed him inside. The agents asked the Defendant additional questions, which took approximately between 15-30 minutes. The agents asked the Defendant whether he had any contacts with his co-defendants. In addition, the agents asked the Defendant if he was willing to wear a concealed wire. He refused. Thereafter, the agents left. FBI Agent Runles described the interaction with the Defendant as cordial, very-matter-of-fact conversation. There was no indication that the Defendant was uncomfortable or that he did not want to talk to the agents.

FBI Agent Runles testified that he did not threaten the Defendant and does not recall hearing NCIS Agent Twilley threaten the Defendant either. The agent, however, may have alluded to the Defendant that "he has a lot of legal problems which could include money laundering or whatever."

5

**C. December 13, 2011 Questioning**

Approximately a year later, on December 13, 2011, FBI Agent Runles called the Defendant to ask him if they could meet. The Defendant agreed. FBI Agent Runles testified that he believes it was the Defendant who again suggested that they meet at the MGM Spa Building parking lot. When FBI Agent Runles called, the Defendant said that he "can come over right now." The agents arrived at the MGM parking lot before the Defendant and thus waited for him for approximately 10 minutes until he arrived. The agents present during this meeting were FBI Agent Runles and IRS-Criminal Investigation Special Agent Todd Peterson.

According to FBI Agent Runles, it was IRS Agent Peterson who wanted to speak with the Defendant because "there were a couple of loose ends that we wanted to tie up." The meeting was described as cordial and lasted approximately 10-15 minutes under the hot sun. The agents did not go inside the MGM Spa Building.

IRS Agent Peterson testified that the defendant was "very agreeable, agreeable to meet with us" and that the meeting was not confrontational. Also, IRS Agent Peterson stated that the defendant did not ask for an attorney.

Government Exhibit No. 13 was admitted into evidence. The exhibit is an IRS regulation governing interviews in a criminal investigation. IRS Agent Peterson testified that IRS conducts two different types of investigation: administrative (criminal) investigation and grand jury investigation. In an administrative investigation, the IRS agents investigate tax cases, and agents are required to advise the person being interviewed their rights (either noncustodial advice of rights, or custodial advice of *Miranda* rights, depending on the situation). The U.S. Attorney's Office is not involved in administrative investigation due to tax disclosure laws.

In a grand jury investigation, the matters involved are non-tax cases. Specifically, it

6

involves mainly money laundering charges and structuring. In these investigations, IRS agents are not required by their agency regulations to advise a person of their rights, unless advised by the U.S. Attorney's Office.

IRS Agent Peterson testified that the interview with the Defendant was not an administrative criminal investigation. It does not involve tax-related matters. Moreover, had it been an administrative investigation, the presence of an FBI agent would not have been allowed except under limited circumstances.

## II. DISCUSSION

Defendant William Perez contends that he should have been given his *Miranda* rights on December 14, 2010, December 17, 2010, and December 13, 2011. *See* ECF No. 102. The Defendant also contends that his Fifth Amendment right to remain silent was violated on December 14, 2010.[6] *See* ECF Nos. 113 at 4, and 102 at 3. In addition, the Defendant contends that his Sixth Amendment right to counsel was violated on December 14, 2010,[7] and December 13, 2011. *See id.* and ECF No. 113 at 6. Thus, the Defendant is asking that the statements he made on those dates be suppressed.

On a motion to suppress, the controlling burden of proof imposes no greater burden than proof by a preponderance of the evidence. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). Moreover, the prosecution, as the proponent of the evidence, must bear the burden of proving its admissibility. *See United States v. Coades*, 468 F.2d 1061, 1064 (3d Cir. 1972); *United States v. Colbert*, No. 89-310, 1990 WL 5200 at *1 (D.N.J. January 23, 1990) (citing *Katz*

---

[6] Because the court grants the Defendant's motion to suppress statements made on December 14, 2010, based on the agents violating the defendant's right to a *Miranda* warning, the issue of whether the Defendant's Fifth Amendment right to remain silent was violated on December 14, 2010, will not be discussed because the matter is moot.
[7] Because the court grants the Defendant's motion to suppress statements made on December 14, 2010, based on the agents violating the defendant's right to a *Miranda* warning, the issue of whether the Defendant's Sixth Amendment right to counsel was violated on December 14, 2010, will not be discussed because the matter is moot.

7

*v. United States*, 389 U.S. 347 (1967)).

**A. Miranda Warning on December 14, 2010**

"No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In order to permit a full opportunity to exercise the privilege against self-incrimination, the U.S. Supreme Court in *Miranda v. Arizona* decided that the accused must be adequately and effectively apprised of his rights. 384 U.S. 436, 467 (1966). If a person in custody was questioned without first being apprised of his rights, any statements made at that time may not be admitted as evidence against him. *Stansbury v. California*, 511 U.S. 318, 322. (1994); *United States v. Williams*, 435 F.3d 1148, 1152 (9th Cir. 2006).

The obligation to administer a *Miranda* warning is triggered "only where there has been such a restriction on a person's freedom as to render him 'in custody'." *Stansbury*, 511 U.S. at 322 (citations omitted). To determine whether the person is "in custody," the court must examine all of the circumstances surrounding the interrogation. *Id*. However, the ultimate inquiry is whether there was a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest. *Id. See also United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004), citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (The critical question is whether the defendant's freedom to depart was restricted in any way); *Miranda*, 384 U.S. at 444 (*Miranda* warning applies when a person is questioned by a law enforcement officer after being "taken into custody or otherwise deprived of his freedom of action in any significant way.").

The court looks "at the totality of the circumstances while keeping in mind that the determination is based 'on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" *LeBrun*, 363 F.3d at 720, citing *Stansbury*, 511 U.S. at 322-23. *See also United States v. Craighead*, 539 F.3d

8

1073, 1082 (9th Cir. 2008). The court asks whether a reasonable person in those circumstances would "have felt he or she was not at liberty to terminate the interrogation and leave." *Craighead*, 539 F.3d at 1082, citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). *See also U.S. v. Revels*, 510 F.3d 1269, 1274 (10th Cir. 2007) (Citing the U.S. Supreme Court in *Berkemer v. McCarty*, 468 U.S. 420, 441-42 (1984), the court indicates that the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation).

This requires a fact-specific analysis that involves various factors when examining the totality of the circumstances. In 2008, the Ninth Circuit used the following factors: (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats or intimidation; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made. *Craighead*, 539 F.3d at 1084.

In *Craighead*, there were eight law enforcement officers from three different agencies who entered the defendant's residence. 539 F.3d at 1078. Some were armed, and some unholstered their firearms during the search. *Id.* All of the FBI agents were wearing flak jackets ("raid vests"). *Id.* One agent informed the defendant that he was not under arrest, any statement from him is voluntary, and he would not be arrested that day regardless of what information he provides. *Id.* The defendant was escorted to a storage room for questioning with the door shut closed. *Id.* Two law enforcement officers were present, and one of them stood near the exit. *Id.* The interview lasted 20 to 30 minutes long. *Id.* No force or threats were used to induce the defendant to speak with the officers. *Id.* at 1079. The defendant testified that the "prevailing mood of the morning" left him with the impression that he was not free to leave. *Id.* Despite the defendant being told that he was not under arrest and any statement from him is voluntary, the

9

Ninth Circuit found custodial interrogation for *Miranda* purposes because (1) the place was a police-dominated environment (defendant's home was crawling with a large number of officers wearing raid jackets and visibly armed);[8] (2) the defendant was restrained in some way (the interview occurred in a closed-door storage room with one officer positioning himself near the exit); and (3) the defendant was isolated from others (defendant was interviewed without any support system with him—family, friends or colleagues, who are important to lend moral support and deter a suspect from making inculpatory statements). *Id.* at 1084-89.

In *Revels*, seven police officers executed a search warrant on Revels' home at 6:00 a.m. 510 F.3d at 1270. The defendant was immediately detained, restrained in handcuffs, and placed face down on the floor. *Id.* After approximately ten minutes of searching the home, the handcuffs on the defendant were removed. *Id.* at 1271. The defendant was separated from her boyfriend and children, and she was escorted to a rear bedroom for questioning with closed door. *Id.* at 1275. During the questioning, one of the officers confronted the defendant with a bag of cocaine seized during the search. *Id.* at 1276. The police never told the defendant she was free to leave or to terminate the police questioning. *Id.* Citing *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993), the court stated that "[t]he lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention." *Id.* at 1276. Looking at the totality of the circumstances—to include being restrained temporarily in handcuffs, police-dominated atmosphere (seven police officers in the house), being separated, and not being told that Revels was free to leave—the court found custodial interrogation for Miranda purposes. *Id*. at 1277.

---

[8] *See also Orozco v. Texas*, 394 U.S. 324, 325 (1969) (holding that an interrogation was custodial where four police officers arrived at the suspect's home, entered the bedroom, and behaved as though the suspect was not free to leave while he was questioned); *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (finding suspect was in custody although interrogated in his home because of the "level of physical control that the agents exercised over" the suspect).

Similar to *Craighead* and *Revels*, in the present case, there was a large number of federal agents from three different agencies. FBI Agent Runles testified that there were approximately 10-15 agents from the FBI, NCIS, and IRS. The agents were wearing raid jackets with 6-inch "FBI" lettering on them, and underneath the raid jackets were bullet proof vests. The agents were armed and were banging on the door. Upon entrance to the building, weapons were drawn as the agents secured the premises. Once the agents secured the premises, agents were posted at the exits to maintain control of the building.

The Defendant was immediately restrained when federal agents entered the spa building. FBI Agent Runles took control of the Defendant at the doorway by placing him against the wall, cuffing his hands behind his back, and frisking him. While still handcuffed, FBI Agent Runles held the Defendant's arm and escorted him to the game room. There, the agent removed the Defendant's handcuffs and directed him to sit by a corner poker table.

The Prosecution argues that handcuffing a defendant while officers conduct a security sweep is proper. *See* ECF No. 108 at 2-3. The brief detention of the Defendant is no doubt proper. The Ninth Circuit held that when conducting a lawful search, physical control of the suspect is necessary to preserve evidence and protect the safety of the law enforcement officers. *Craighead*, 539 F.3d at 1086. *See also Michigan v. Summers*, 452 U.S. 692, 699-704 (1981) (Frisking and detention of a person while the premises are searched are acceptable way to ensure safety of officers); *United States v. Bautista*, 684 F.2d 1286, 1292 (1982) ("handcuffing a suspect does not necessarily dictate a finding of custody"). However, the fact that these precautions are necessary to the safety of the officers and the preservation of evidence does not lessen the tendency to make a reasonable person believe he is in custody. *Craighead*, 539 F.3d at 1086.

The Prosecution also argues that the Defendant was not isolated and that the questioning was conducted in a large game room in front of numerous other people who were being

interviewed at the same time. Although the Defendant was not placed in a separate room, unlike the defendants in *Craighead* and *Revels*, it does not change the fact that the Defendant was isolated from others. The Defendant was questioned alone in the corner of the game room, separate from others who were also being questioned in other areas of the game room. The Prosecution failed to provide evidence as to the exact number of people being interviewed at the same time that the Defendant was being interviewed.

In addition, the Defendant was not informed that he was free to leave or free to terminate the interview.

Looking at the totality of the circumstances—the building crawling with 10-15 armed law enforcement officers from three different agencies, FBI Agent Runles making it known that he had control of the Defendant, the Defendant being handcuffed at one point, and the Defendant being isolated from others during the interview and not being told he was free to leave—a reasonable person in the Defendant's position would have felt he was not at liberty to terminate the interrogation and leave. Thus, the court must find in accordance with the Ninth Circuit that the questioning that occurred on December 14, 2010 is custodial in nature.

Accordingly, the Defendant's motion to suppress his statements made on December 14, 2010 is hereby **GRANTED**.

**B. Miranda Warning on December 17, 2010**

The Defendant argues that no reasonable person in the Defendant's position would have felt free to say no to a meeting with the very same agents who questioned him two nights earlier. ECF No. 113 at 5-6.

The courts have held that Miranda warnings are not required if the suspect is not placed under arrest, voluntarily comes to the police station, and is allowed to leave unhindered by police after the interview. In *California v. Beheler*, 463 U.S. 1121, 1121-22 (1983), the defendant

voluntarily agreed to accompany the police officers to the police station. *Id*. at 1122. The defendant then agreed to talk and after talking, he left the police station unhindered. *Id*. The defendant was not arrested after the interview. *Id*. Based on these facts, the Supreme Court found that "it is beyond doubt that [the defendant] was neither taken into custody nor significantly deprived of his freedom of action. [The defendant's] freedom was not restricted in any way whatsoever." *Id*. at 1123.

Similar to *Beheler* is *Mathiason*, 429 U.S. 492 (1977). In that case, the Supreme Court found that the defendant was not in custody, because there was no indication that the questioning took place in a context where the defendant's freedom to depart was restricted in any way. *Id*. at 495. The defendant came voluntarily to the police station, where he was informed that he was not under arrest, and he left the police station without hindrance. *Id*.

Moreover, the Ninth Circuit found in *United States v. Hayden*, 260 F.3d 1062 (9th Cir. 2001), that the defendant cannot be considered "in custody" because the defendant voluntarily went to the FBI office on two separate occasions, provided her own transportation to both meetings, was told she was free to leave, and was not placed under arrest or restrained during the interview. *Id*. at 1063-66.

Similarly in this case, the Defendant provided his own transportation and voluntarily met with FBI Agent Runles and NCIS Agent Twilley. The Defendant consented to additional questioning and according to FBI Agent Runles, there was no indication that the Defendant was uncomfortable or that he did not want to talk to them. When the agents were done questioning the Defendant, they left. The interview lasted for approximately 15-30 minutes. The Defendant was not arrested at the end of the interview, and there was no evidence to show the Defendant was restrained in any way or was hindered from leaving the building.

FBI Agent Runles also testified that he did not threaten the Defendant, but he may have

13

alluded to the Defendant that he has "a lot of legal problems." Although police tactics marginally favor custody, it is not the deciding factor. Interviewing of a suspect will always have coercive aspects to it. *Mathiason*, 429 U.S. at 495.

Looking at the totality of the circumstances, the interview of December 17, 2010 is non-custodial. The Defendant voluntarily met with the agents and consented to an interview. There is no evidence to show that the Defendant's freedom of movement was restrained or that he was deprived of his freedom of action in any significant way. Accordingly, the Defendant's motion to suppress statements made on December 17, 2010 is hereby **DENIED.**

C. **Miranda Warning on December 13, 2011**

Similar to the December 17, 2010 analysis, *supra*, the interview on December 13, 2011 was non-custodial. When the federal agent contacted the Defendant, the Defendant voluntarily agreed to meet with the agents. Having agreed to meet at the parking lot of the MGM Spa Building, the Defendant provided his own transportation. The interview lasted between 10-15 minutes under the hot sun. Being in an open space in a parking lot, there is no evidence to indicate that the Defendant was restrained or hindered from leaving. A reasonable person in the Defendant's situation would not have felt that he would have been in custody or that he was deprived of his freedom of action in any significant way.

The Defendant argues that he was misled by the agents into believing that he was not a suspect in this case. *See* ECF No. 113 at 6. The basis for the Defendant's argument is that because the agents transitioned from the proverbial "bad-cop" on the night of the raid to the proverbial "good-cop" during this interview, the Defendant "reasonably believe[d] that he was not the focus of [the agents'] investigation, that he did not require an attorney . . ." or "that his statements would not be used against him," and that he was lulled "into a false sense of security." *Id.* The courts have already decided on this matter, that there is nothing wrong with

14

questioning tactics such as deception or a sympathetic attitude on the part of the law enforcement officer. *Jenner*, 982 F.2d at 334, citing *Miller v. Fenton*, 796 F.2d 598, 607 (3d Cir. 1986), *cert. denied*, 479 U.S. 989 (1986); *Martin v. Wainwright*, 770 F.2d 598, 925-27 (11th Cir. 1985); *Hawkins v. Lynaugh*, 844 F.2d 1132, 1140 (5th Cir.), *cert. denied*, 488 U.S. 900 (1988) ("[T]here is nothing inherently wrong with efforts to create a favorable climate for confession.").

In addition, the Defendant asserts that IRS Agent Peterson did not advise him of his right against self-incrimination and of the criminal investigation being conducted, as required by IRS regulations. *See* ECF Nos. 102 at 6, and 113 at 6. Thus, the Defendant argues that his statements should be suppressed because failure to comply with IRS regulations renders answers to questions inadmissible in court, as concluded by the Ninth Circuit in *United States v. Sourapas*, 515 F.2d 295 (9th Cir. 1975). However, Defendant's reliance in *Sourapas* is outdated. The Ninth Circuit noted that the continuing validity of its holding in *Sourapas* is questionable. *United States v. Rutherford*, No. 99-00159, 2002 WL 770486, at *2 (9th Cir. Apr. 29, 2002). The Ninth Circuit cites U.S. Supreme Court cases to support its conclusion that the *Sourapas* holding has "long been superceded." *Id.* For example, in *United States v. Caceres*, 440 U.S. 741, 754-56 (1979), the U.S. Supreme Court held that evidence obtained in violation of IRS regulations is admissible in a criminal trial, provided that there are no constitutional or statutory violation. *See also Beckwith v. United States*, 425 U.S. 341, 347-48 (1975) (An IRS agent does not need to provide *Miranda* warnings to an individual under IRS investigation before questioning unless that individual was in custody or special circumstances exists "such as to overbear [the individual's] will to resist and bring about confessions not freely self-determined."). In accord with the Supreme Court decisions, the Ninth Circuit in *United States v. Snowadzki*, 723 F.2d 1427, 1430-31 (9th Cir. 1984), held that "[a]bsent unusual circumstances, the exclusionary rule does not apply when IRS agents violate internal regulations, without also infringing on

15

constitutional or statutory rights."

As discussed *supra*, there is no evidence that the meeting between the two federal agents and the Defendant on December 13, 2011 was custodial in nature. Further, there is no evidence of "special circumstances" such as to overbear the Defendant's "will to resist and bring about confessions not freely self-determined." Accordingly, IRS Agent Peterson was not under any legal duty to provide *Miranda* warnings to the Defendant. The Defendant's motion to suppress statements made on December 13, 2011, is hereby **DENIED**.

Because the case law that the Defendant is relying on in making his argument has been superseded, it is not necessary for this court to address the arguments made by the parties at the evidentiary hearing on the distinction between an IRS administrative criminal investigation and grand jury investigation.

D. **Sixth Amendment Right to Counsel on December 13, 2011**

The Defendant argues that his Sixth Amendment right to counsel was violated. The Defendant mentions two things he claims violated his right to counsel on December 13, 2011: (1) Defendant was told he did not need his attorney present; and (2) Defendant had apprised the agents of his attorney's name and they told him they only wanted to ask a few questions. *See* ECF Nos. 102 at 5, and 113 at 6.

The Sixth Amendment provides in relevant part the following: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. CONST. amend. VI. The Sixth Amendment right to counsel attaches at the first formal proceeding against an accused. *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). *See also Davis v. United States*, 512 U.S. 452, 456 (1994). In this case, the Defendant has not been formally charged at the time of the questioning and therefore the Sixth Amendment right to counsel does not apply.

However, in *Miranda v. Arizona*, 384 U.S. at 469-73, the U.S. Supreme Court held that a suspect subject to custodial interrogation has the right to an attorney and to have that attorney present during interrogation. Invoking *Miranda* right to counsel applies only when a suspect is under custodial interrogation. *McNeil*, 501 U.S. at 178-81. *See also Davis*, 512 U.S. at 456 ("[A] suspect subject to custodial interrogation has the right to consult with an attorney"); *United States v. Hines*, 963 F.2d 255, 256 (9th Cir. 1992) ("[I]t is well established . . . that the Fifth Amendment right to counsel under *Miranda* does not vest until a defendant is taken into custody.").

Because the Defendant was not in custody on December 13, 2011, the Defendant does not have the right to counsel under *Miranda*. In addition, there is no evidence to show that the Defendant asked for an attorney.

Accordingly, the Defendant's motion to suppress statements made on December 13, 2011, based on violation of his right to counsel is hereby **DENIED.**

### III. CONCLUSION

With respect to the December 14, 2010 questioning, the motion to suppress is hereby **GRANTED**. With respect to the December 17, 2010 questioning, the motion to suppress is hereby **DENIED.** With respect to the December 13, 2011 questioning, the motion to suppress is hereby **DENIED.**

**SO ORDERED.**



**/s/ Frances M. Tydingco-Gatewood**
   **Chief Judge**
**Dated: Jul 17, 2012**